<b><u>AFFIDAVIT IN SUPPORT OF AN<br>APPLICATION FOR A SEARCH WARRANT</u></b>

2:25mj943 CMR

I, Brad Simons, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the FBI in Salt Lake City, Utah. I have been an FBI Special Agent since 2014. In my capacity as a Special Agent with the FBI, I have conducted and participated in numerous official investigations into mail and wire fraud, money laundering and other financial and computer crimes as well as drug trafficking crimes. I am a graduate of the FBI Training Academy in Quantico, Virginia and have also attended training classes in the investigation of financial crimes.

3. As an FBI Special Agent, I am familiar with the use of financial accounts by those who operate fraudulent schemes and the types of transactions reflected on financial account records. I am also familiar with the principles of tracing assets into and through financial accounts, including the subsequent purchase of property using the originally traced assets.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1344 (Bank Fraud), 1349 (Conspiracy to Commit Wire Fraud and Attempted Wire Fraud), 1956 (Concealment Money Laundering), and 1028A (Aggravated Identity Theft) have been committed by ERIK BLOMQUIST, JUSTIN HEIDEMAN, and others (hereinafter "TARGETS"), and evidence of the violations will be found on the Device described below.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The property to be searched is black and grey Apple iPhone seized from Blomquist during a search incident to arrest on October 3, 2025, hereinafter the "Device." The Device is currently located at the Federal Bureau of Investigation Evidence Control Room located at 5425 W. Amelia Earhart Drive, Salt Lake City, UT 84116.

7. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8. In my law enforcement experience, individuals who defraud victims often use electronic devices such as cell phones to communicate with victims, plan with co-conspirators, and plan and execute financial transactions central to the scheme.

9. A federal grand jury returned an indictment on Wednesday, October 1, 2025, charging Erik Blomquist with 11 criminal fraud counts and Justin Heideman with 3 criminal fraud counts (25-cr-00361). The indictment charges 8 separate fraud schemes. The below

2

summarizes some of the evidence of these charged schemes that establishes probable cause for the search requested.

### Victim: Seasonal Lender 1

10. Blomquist and others owned and operated a sport boat rental company called Inland Boat Club from at least 2019 to May 2022. The boat club offered memberships that entitled members access to newer boats in Utah and surrounding states.

11. Blomquist borrowed money to buy boats to operate Inland Boat Club from multiple individuals, some of whom were referred to as "seasonal loan investors."

12. Seasonal Lender 1 and Seasonal Lender 2 initially met Blomquist through their memberships in Inland Boat Club.

13. Blomquist agreed to pledge 26 specific boats and 2 wave runners to Seasonal Lender 1 as collateral for Seasonal Lender 1 loan of $1,285,000 for Loan 1 (for boat purchases) and a loan of $682,500 for Loan 2 (as an operational expense bridge loan). Loan documents for Loan 1 state, "…the Principal Amount of this Note must be used by Maker solely to purchase the Collateral and for no other purposes." Loan documents for Loan 2 state, "…the Principal Amount of this Note must be used by Maker solely for operational expenses and no other purposes."

14. Blomquist communicated through phone calls, text messages, and emails with Seasonal Lender 1 in order to obtain Loan 1 and Loan 2. Regarding Loan 2, Blomquist texted Seasonal Lender 1 on November 23, 2020:

> "I'll send it soon….And sending you that email…on the other $, if you can help with that, it will be paid back within 45 days with 2 points (2 percent going to you/your capital

account) and it will help us secure that larger credit line with Wells Fargo which will be an absolute boon and increase our valuation with Correct Craft."

15. Seasonal Lender 1 provided the funds for Loan 1 and Loan 2 to Blomquist over the course of 2020 and early 2021. Both Loan 1 and Loan 2 were reaffirmed in January 2021 in amended loan documents.

16. Blomquist told Seasonal Lender 1 that he would not allow the boats to be further encumbered by any other security interests. Blomquist agreed not to sell the collateral boats without permission of Seasonal Lender 1. Blomquist promised to perfect and maintain Seasonal Lender 1's security interest in the boats.

17. Blomquist did not perfect or maintain Seasonal Lender 1's security interest in the promised collateral. Blomquist later pledged the same Seasonal Lender 1 collateral boats as collateral to other lenders.

18. Rather than purchase boats and pay operational expenses as promised, Blomquist used the majority of Seasonal Lender 1's loan proceeds to re-pay previous lenders. BLOMQUIST also used the money to pay himself.

<u>Victim: Seasonal Lender 2</u>

19. Blomquist also induced Seasonal Lender 2 to lend $1,000,000 in short-term financing for the purchase of boats. The loan term was one month, with an option to extend for one more month, for a total possible loan period of 60 days.

20. Blomquist promised to use the loan proceeds to buy boats. He pledged six specific boats to Seasonal Lender 2 as collateral securing the $1,000,000 loan. Loan documents for Seasonal Lender 2's loan state, "The purpose of the Loan is to assist Borrower with bridge

financing for the purchase of boats and products and to meet certain payment deadlines and to assist Borrower to accomplish general corporate purposes."

21. Blomquist represented to Seasonal Lender 2 that the boats serving as collateral were unencumbered and free and clear of all liens, restrictions, and limitations. Blomquist promised that he would perfect Seasonal Lender 2's security interest in the boats by making a UCC-1 filing with the State of Utah. Blomquist promised Seasonal Lender 2 that Seasonal Lender 2 had a perfected first-priority security interest in the boats in question. Blomquist promised that he would not allow any other lien or security interest to encumber the boats pledged as collateral for Seasonal Lender 2's loan.

22. These representations and promises were false. The six boats pledged as collateral to Seasonal Lender 2 had, in fact, already been pledged as collateral to Seasonal Lender 1. Blomquist did not perfect Seasonal Lender 2's security interest by filing a UCC-1 filing with the State of Utah. Blomquist also further encumbered these 6 boats by pledging them as collateral to future lenders.

23. Blomquist also pledged his house in Farmington, UT as collateral on Season Lender 2's loan. On February 3, 2021, Blomquist texted Season Lender 1 a picture of the Warranty Deed to his house in Farmington, UT. Blomquist then texted Seasonal Lener 2, "Deed to the house, send me Greg's info after you send the wire and I'll get him all the info he needs".

24. Blomquist used the majority of the Seasonal Lender 2 loan proceeds to repay previous lenders, pay operational expenses, and pay himself.

25. Blomquist promised to repay Seasonal Lender 1 and Seasonal Lender 2 when he obtained a $3.9 million SBA loan through Rock Canyon bank in spring 2021. He obtained an SBA loan but did not use the proceeds to repay Seasonal Lender 1 or Seasonal Lender 2.

26.     Blomquist made many subsequent misrepresentations regarding repayment to Seasonal Lender 1 and Seasonal Lender 2.  They were not repaid.

### Victim: Rock Canyon Bank

27.     In or around the spring of 2021, Blomquist, on behalf of Inland Boat Club, sought an SBA 7a loan from Rock Canyon Bank, a Small Business Administration preferred lender. Blomquist stated that the proceeds would be used to refinance existing debt, purchase new boats, and provide working capital.

28.     In the submitted application, Blomquist answered "no" to the question asking whether he had ever been convicted of a criminal offense.  In fact, at the time of this application, as Blomquist well knew, he had been convicted of (1) Securities Fraud in 2015 and (2) Theft by Deception and Forgery 2012, both in Utah Fourth District Court.

29.     Blomquist pledged 25 boats and 2 wave runners as collateral for the SBA loan. Blomquist claimed that the boats serving as collateral for the SBA loan were free and clear of all liens and encumbrances other than the lien from the SBA loan.  Blomquist knew was not true. Boats that were pledged as collateral to Rock Canyon Bank for the SBA loan had already been pledged to other lenders, including Seasonal Lender 1 and Seasonal Lender 2.

30.     Relying on Blomquist's misrepresentations, Rock Canyon Bank approved a loan of $3.924 million for Inland Boat Club in May 2021 under the name Inland Boat Club Holdings II.  Blomquist submitted and signed the loan documents as manager of the boat club.

31.     Of the SBA loan fund proceeds, $1.2 million were designated to buy new boats. The bank required documentation supporting the purchase of a particular boat before it would release funds for the purchase.  Blomquist provided fraudulent boat purchase documents to Rock

Canyon Bank to gain access to these funds. For example, he submitted fraudulent purchase agreements, fake bills of sale, and phony boat Hull Identification Numbers.

33. Instead of purchasing new boats with these funds, Blomquist used the funds to repay old lenders and to pay himself.

<u>Victim: Larry H. Miller Chrysler Jeep Dodge Ram</u>

33. In May 2024, Blomquist sought to purchase two vehicles from Larry H. Miller Chrysler Jeep Dodge Ram in Sandy, Utah. Blomquist and his wife left the dealership with the two vehicles with a promise to wire roughly $150,000, the full amount due for the two vehicles.

34. The dealership did not receive payment despite numerous requests and promises to pay by Blomquist. Blomquist used deceptive tactics to put off payment.

35. During one conversation regarding the lack of payment, Blomquist claimed he was on an airplane and couldn't talk on the phone to a dealership representative. Roughly 5 minutes later, another dealership employee saw Blomquist eating at a restaurant with his wife in Draper, Utah.

36. Blomquist provided multiple bounced checks for the amount owed for the two vehicles. Blomquist provided a screenshot of his bank account to dealership representatives purporting to show that both checks had cleared Blomquist's bank account. The dealership was later notified that the two checks had bounced.

37. Roughly four months after taking possession of the vehicles with the promise of payment, Blomquist provided sufficient funds to pay for the remaining amounts owed for the vehicles.

38. In October 2024, Blomquist attempted to buy a third vehicle from the same dealership. Dealership management informed staff that Blomquist was not to be allowed to take possession of any vehicle until purchase funds had cleared through the dealership's bank.

39. While dealership management was out of town, Blomquist brought a check to the dealership's finance department for $103,190.74, the full purchase price of the third vehicle, a Dodge Ram 3500 VIN 3C63RRRL7RG225388. Based on this check, employees at the dealership provided the vehicle to Blomquist and signed over title to Blomquist's business name.

40. The $103,190.74 check bounced for insufficient funds.

41. On December 13, 2024, Blomquist corresponded via email with representatives of the dealership regarding their demand for immediate return of the third vehicle or payment in full. Blomquist assured the dealership that he and his company had "no intention of not fulfilling [our] financial obligations with your dealership nor is there any intent of unjust enrichment, or any intent to not honor the vehicle purchase agreement and definitely no fraudulent misrepresentation."

42. Blomquist claimed in the email that the failed payments were the result of bank technicalities or "an overly protective fraud prevention team" at one of the banks. He offered to provide a cashier's check for the full amount within three days.

43. In January 2025, Blomquist provided a cashier's check purportedly from JPMorgan Chase for the precise amount of the third vehicle purchase, $103,190.74. This cashier's check was fraudulent.

44. In March 2025, Blomquist engaged in further email communications with dealership representatives, attempting to put off their complaints of non-payment as "just a very big misunderstanding."

45. On or about April 3, 2025, Blomquist traded in the stolen 2024 Dodge Ram 3500 to National Auto Plaza in exchange for a 2024 Lexus GX VIN JTJTBCDX4R5030583. The Lexus GX had a purchase price of $94,914.41. Blomquist was given an allowance for trade in of $73,000 for the Dodge Ram. Blomquist paid the balance due via cashier's check.

Victim: Person-2

46. Erik Blomquist was the manager of Two 2's Ranchland Holding Company LLC. Blomquist approached Person-2 about lending $2.5 million on short term basis to serve as "proof of funds" in order to secure the purchase of a large piece of land near Fillmore, Utah.

47. Person-2 agreed to loan $2.5 million to Blomquist via his LLC for four weeks at 7% interest.

48. As part of the loan, the parties agreed that the loan proceeds would remain on deposit with Blomquist's attorney, Justin Heideman, never to be moved from the attorney IOLTA account until it was repaid to Person-2. An IOLTA account is a type of trust account used by lawyer to hold funds that belong to clients or other third parties.

49. Heideman separately assured Person-2 via letter that "no transfer of these funds will take place without express written authorization, which authorization must then be confirmed verbally by telephone."

50. The funds were wired from Person-2's LLC to Heideman on March 15, 2024.

51. On March 22, 2024, Heideman sent a text message to Person-2 along with a screenshot of an email purporting to have been written by Person-2 to Blomquist stating that Person-2 "ultimately [doesn't] care what happens with the funds. . . as long as they are paid back as agreed."

52.     Heideman stated via text message that he had received the screenshot of the purported email from Person-2 to Blomquist and would therefore be "releasing funds today for [Blomquist]'s purposes." Heideman sought confirmation from Person-2 that this was in accordance with Person-2's instructions.

53.     Person-2 responded via text message that he never sent the email in question, that he had never authorized the release of funds, and the loan funds were not to be moved under any circumstances.

54.     Further investigation revealed that the purported email from Person-2 authorizing the release of funds was sent from a Gmail email account, whose address was a slight derivative of Person-2's full name. The name assigned to the spoofed email account was Person-2's actual name.

55.     Google records obtained during the investigation revealed that on or about March 21, 2024, Blomquist created the spoofed Person-2 email account. From the spoofed account, Blomquist sent the unauthorized fund release email. He then sent a screenshot of the spoofed email to Heideman as part of a scheme to obtain the funds from Heideman's IOLTA account.

56.     Blomquist and Heideman were charged in an 11 count Indictment in the District of Utah on October 1, 2025. Blomquist and Heideman were both arrested on October 3, 2023. During a search incident to arrest, FBI agents located and seized the Device from Blomquist's front pants pocket.

57.     The Device is currently in the lawful possession of the Federal Bureau of Investigation. Therefore, while the Federal Bureau of Investigation might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of

caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

58.     The Device is currently in storage at Federal Bureau of Investigation Evidence Control Room located at 5425 W. Amelia Earhart Drive, Salt Lake City, UT 84116.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Federal Bureau of Investigation.

## **TECHNICAL TERMS**

59.     Based on my training and experience, I use the following technical terms to convey the following meanings:

- a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets,

13

    and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  60. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

61. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

62. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

15

    d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

63.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

64.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

65. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Brad Simons*

Brad Simons
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on October 7, 2025:

*Cecilia M. Romero*

UNITED STATES MAGISTRATE JUDGE